UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| CLAUDE T. HARRELL, JR., Regional Director of Subregion 33 of the National Labor Relations Board, For and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>Petitioner,<br><br>v.<br><br>AMERICAN RED CROSS, HEART OF AMERICA BLOOD SERVICES REGION,<br><br>Respondent. | Case No. 11-1284 |

## **O R D E R**

This matter is now before the Court on Petitioner's Petition for Injunctive Relief under Section 10(j) of the National Labor Relations Act, as amended. For the reasons set forth below, the Petition [#1] is GRANTED IN PART.

### BACKGROUND

Respondent, American Red Cross, Heart of America Blood Services Region, is an unincorporated operating unit of the American National Red Cross with its headquarters and place of business in Peoria, Illinois. It is engaged in the process of recruiting donors, collecting blood, manufacturing various blood products, and distributing those products to facilities throughout the region. On March 21, 2007, the American Federation of State, County and Municipal Employees (AFSCME), Council 31, AFL-CIO (hereinafter referred to as the "Union"), filed a petition to represent a certain class of Respondent's employees. Following a hearing, the Regional Director for Subregion 33 of the NLRB issued a decision finding that certain employees should be in the

bargaining unit; Respondent appealed this decision. On June 1, 2007, the bargaining unit employees voted in an election, but the ballots were impounded pending the outcome of Respondent's appeal.

On September 1, 2010, the NLRB issued an Order affirming the Regional Director's decision. On September 16, 2010, the ballots were counted, and the Union had won the election. Respondent objected to the results of the election on September 23, 2010. The objections were overruled and on October 7, 2010, the Union was certified as the exclusive collective-bargaining representative for the following employees of Respondent:

> All full-time, part-time and per diem collections specialists I, collections specialists II, collections technicians I, collections technicians II, mobile unit assistants I, mobile unit assistant I/collections specialists I, mobile unit assistant I/collections technicians I, mobile unit assistants I/CTI-HH, mobile unit assistants II, mobile unit assistants II/collections specialists I, mobile unit assistants II/CTI-HH, mobile unit supply clerks, collections assistants, and team leaders employed by the Employer in its Donor Services department, excluding office clerical and professional employees, guards and supervisors as defined in the Act and all other employees.

There are 170 members in this bargaining unit. On October 21, 2010, Respondent appealed this decision, and the appeal was denied on December 15, 2010.

While this process was underway, Respondent made changes to bargaining unit employees' terms and conditions of employment. Petitioner alleges that these changes were made unilaterally and in violation of the duty to bargain collectively. Respondent argues that it had no duty to bargain with the Union at this time.

Specifically, Petitioner alleges that from May 29, 2009 through April 14, 2011, Respondent discontinued matching employees 401(k) contributions, suspended merit pay increases, closed the retirement pension plan to new employees, changed employee health insurance benefits, reassigned team leader duties to supervisory employees, refused to bargain, changed employee job

descriptions/classifications/titles/pay grades or salary tiers, changed its policy regarding the assignment of employees to load vehicles, changed the work schedules of mobile unit supply clerks/general services supply clerks, changed its policy regarding the amount of paid time-off employees can carry over from year to year, and reassigned non-bargaining unit employees to perform bargaining unit work on blood drives. Petitioner filed charges corresponding to each of these actions. The parties did not begin bargaining for the first contract until February 27, 2011. On August 18, 2011, an administrative law judge for the NLRB convened a hearing on the underlying charges in this matter, and that review remains pending.

On August 1, 2011, Petitioner filed a Petition for Injunctive Relief under Section 10(j) of the National Labor Relations Act, as amended, seeking preliminary injunctive relief during the pendency of the underlying matters before the NLRB. Following briefing of the issues, an evidentiary hearing and oral argument were held on October 31, 2011. During the hearing, Petitioner advised that it was no longer seeking relief with respect to the portion of the Petition seeking a bargaining order, as the parties have begun to bargain in good faith. This Order follows.

**DISCUSSION**

Section 10(j) of the NLRA provides in relevant part:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant the Board such temporary relief or restraining order as it deems just and proper.

29 U.S.C. § 160(j). In order to determine whether relief is "just and proper", the Seventh Circuit has directed that courts apply the general standards applicable to requests for preliminary injunction. NLRB v. Electro-Voice, Inc., 83 F.3d 1559, 1566 (7th Cir. 1996).

Thus, injunctive relief is warranted if the Regional Director can make a showing: (1) that the Director has no adequate remedy at law ; (2) that the labor effort will suffer irreparable harm if the injunction is not granted, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction; (3) that the public interest will be served by granting the injunctive relief; and (4) that the Director has a reasonable likelihood of prevailing on the merits of his complaint. Lineback v. Spurlino Materials, Inc., 546 F.3d 491, 500 (7th Cir. 2008); Electro-Voice, 83 F.3d at 1566-67; Ty, Inc. v. Jones Group, 237 F.3d 891, 895 (7th Cir. 2001); Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 11-12 (7th Cir. 1992). "The Director bears the burden of establishing the first, third and fourth of these circumstances by a preponderance of the evidence. The second prong is evaluated on a sliding scale: The better the Director's case on the merits, the less its burden to prove that the harm in delay would be irreparable, and vice versa." Spurlino, 546 F.3d at 500; Electro-Voice, 83 F.3d at 1567-68.

*I.     Adequacy of Remedy at Law*

Section 10(j) relief is an extraordinary remedy to be granted only in "those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process." Bloedorn v Francisco Foods, Inc., 276 F.3d 270, 286 (7th Cir. 2001). That being said, it is widely accepted that the longer the employer avoids bargaining with the union, the more likely it is that participation in the union will be chilled and that the union will not be able to be effective in its representation. Id., at 299; Electro-Voice, 83 F.3d at 1573. "This risk is

particularly true in cases involving fledgling unions, where the passage of time is especially critical." Spurlino, 546 F.3d at 501.

Here, the Union is undeniably a "fledgling union" in the preliminary stages of organization and representation of this bargaining unit. It is also clear that the Union has been put in the position of having to bargain to get back benefits or conditions of employment that its members would already have had in the absence of the post-election changes made by Respondent. Evidence was presented indicating that some employees have left their employment with Respondent to obtain better pay. Petitioner also introduced testimony from Union staff representative, Tim Lavelle, that attendance at membership meetings for this bargaining unit has declined from an initial 80 members present in October 2010 to as few as 8-10 members attending in August 2011. There may be many reasons to explain this, but one plausible inference is that it is due to the actions of the Respondent.

The Respondent introduced evidence from five current or former employees indicating that their level of support for the Union was not affected by the delay in this case. This factor alone does not establish that the Union's effectiveness has not been hampered. Respondent also introduced evidence in the form of its Human Resource Manager, Michelle Agnew's, analysis of employee exit surveys. Although Agnew suggested that only one of the surveys from potential bargaining unit employees mentioned the 401(k) benefits as a reason for leaving, she also acknowledged that she hadn't considered whether employees mentioning salary or wages as a reason for leaving could have been referring to the elimination of the merit increases or reduction of hours for certain bargaining unit employees as a result of the post-election changes.

If Respondent is permitted to make changes affecting the bargaining unit's terms and conditions of employment without having brought them to the bargaining table, there is a reasonable inference that payment of damages after the fact will not be sufficient to remedy the adverse impact

to the Union and its members in the interim. In addition, being forced to bargain from a substantially worse position that the Union would have been in had bargaining started shortly after the election places the Union at a continuing disadvantage. One of Respondent's positions is that there was not a union to bargain with. This is due to the Respondent's actions, and although Respondent had every legal right to challenge the union effort, the law does not permit the Respondent to have it both ways. As such, when the Respondent chose to challenge the union attempt, it had a minimum duty to keep things at the status quo or face the consequences of acting unilaterally. The Court is mindful of the need to operate a business nationally, but clearly a better balance was necessary here. Accordingly, Petitioner has minimally met his burden of establishing that he has no adequate remedy at law.

    *II.    Balance of Harms*

The question of whether the labor effort will suffer irreparable harm overlaps significantly with the question of whether the employees have no adequate remedy at law. For many of the same reasons discussed above, the Court finds that the labor effort is likely to suffer substantial and irreparable harm in the absence of preliminary injunctive relief.

> As time passes the likelihood of union formation diminishes, and the likelihood that the employees will be irreparably deprived of union representation increases. . . . The union's position in the plant may deteriorate to the point that effective organization and representation is no longer possible. As time passes, the benefits of unionization are lost and the spark to organize is extinguished. The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable. That loss, combined with the likelihood that the Board's ability to rectify the harm is diminishing with time, equals a sufficient demonstration of irreparable harm to the collective bargaining process.

Electro-Voice, 83 F.3d at 1573.

The Respondent argues that the Union has not suffered harm because several of the purported unilateral changes have been resolved either through bargaining or voluntarily. However, it is

generally accepted that voluntary remedial action does not render such claims moot in the absence of a finding that "the likelihood of further violations is sufficiently remote to make [judicial] relief unnecessary." Ahrens v. Bowen, 852 F.2d 49, 52 (2nd Cir. 1988), *citing* United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953); Kobell v. United Paperworkers International Union, AFL-CIO, CLC, 965 F.2d 1401, 1411 (6th Cir. 1992). As the record in this case does not support such a finding, the Court concludes that partial remedial action does not render the complaints in this action moot.

With the exception of claimed harm that would result from a retroactive restoration of 401(k) benefits, Respondent has offered no countervailing demonstration of irreparable harm that would result from a grant of injunctive relief. Any legitimate compliance burdens and/or interest in Respondent's management prerogatives can be acknowledged by fashioning an appropriately tailored remedy.

### III. *Public Interest*

The Seventh Circuit has held that "[t]he public interest is furthered, in part, by ensuring that 'an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge.'" Electro-Voice, 83 F.3d at 1574, *citing* Miller, for and on Behalf of NLRB v. California Pacific Medical Center, 19 F.3d 449 (9th Cir. 1994). In other words, it is in the public interest to prevent the remedial purpose of the NLRA or the remedial powers of the NLRB from being undermined. Id. Forcing the Union to bargain at a substantial deficit would indeed frustrate the remedial purpose of the NLRA, and it certainly cannot be said to be "in the public interest" to now use the restorations of benefits as a bargaining chip. The Respondent has made no contrary showing that injunctive relief would harm the public interest. Thus, the Court finds that the public interest weighs in favor of at least a partial award of injunctive relief.

### IV. *Likelihood of Success on the Merits*

In this respect, the Court's inquiry is confined to the narrow question of the likelihood that the Director will prevail before the NLRB. Spurlino, 546 F.3d at 502. "For our purposes, we must decide whether the Director has a better than negligible chance of success: whether the Director has 'some chance' of succeeding on the merits." Id., *citing* Electro-Voice, 83 F.3d at 1568. After a review of the evidence of record, the Court must conclude that Petitioner has made a "better than negligible" showing of likelihood of success on the merits on the charge that Respondent made unilateral changes in the terms and conditions of employment without bargaining over those issues.

Petitioner has demonstrated that the Union election was held on June 1, 2007. Ballots were impounded pending appeal, and the Union was certified as the collective bargaining representative for the bargaining unit on October 7, 2010. The first bargaining session was not held until February 27, 2011. In the interim, Respondent made changes arguably affecting the terms and conditions of bargaining unit employees' employment on or about April 2, 2009 (discontinued matching 401(k) contributions, suspended merit pay increases, closed the pension plan to new employees, and changed health insurance benefits), April 5, 2009 (reassigned team leader duties to supervisory employees), September 2010 (changed employee job descriptions, classification/titles, pay grades and/or salary tiers), January 1, 2011 (changed the amount of paid time-off employees could carry over), February 2, 2011 (reassigned work on blood drives to non-bargaining unit employees), and February 7, 2011 (changed the assignment of employees to load vehicles and schedules of mobile unit supply clerks/general services supply clerks). These changes were made without consulting the Union or being brought to the table for bargaining.

Respondent's defense is based largely on the suggestion that because it acted before the date that the Union became certified, there was no representative in place to trigger the obligation to bargain and that the requirement to bargain is not triggered unless the employer actually knew that

the union had majority support at the time. This argument is unavailing. NLRB precedent clearly establishes that:

> [A]bsent compelling economic considerations for doing so, an employer acts at its peril in making changes in terms and conditions of employment during the period that objections to an election are pending and the final determination has not yet been made. And where the final determination on the objections results in the certification of a representative, the Board has held the employer to have violated Section 8(a)(5) and (1) for having made such unilateral changes. Such changes have the effect of bypassing, undercutting, and undermining the union's status as the statutory representative of the employees in the event a certification is issued. To hold otherwise would allow an employer to box the union in on future bargaining positions by implementing changes of policy and practice during the period when objections or determinative challenges to the election are pending.

NLRB v, Mike O'Connor Chevrolet-Buick-GMC Co., Inc., 209 NLRB 701, 703 (Mar. 14, 1974); NLRB v. Laney & Duke Storage Warehouse Co., Inc., 151 NLRB 248, 266-67, *enforced in relevant part*, 369 F.2d 859, 869 (5th Cir. 1966). The Seventh Circuit has reached the same holding. NLRB v. Livingston Pipe & Tube, Inc., 987 F.2d 422, 428 (7th Cir. 1993); NLRB v. Friends of Specialized Living Center, 879 F.2d 1442, 1445 (7th Cir. 1989). Given this precedent, Petitioner has met his burden of demonstrating a considerable chance of success on the merits. Any other construction of this precedent would empower an employer wanting to make additional changes to the terms and conditions of employment to paralyze the union by simply challenging the election process and having the ballots impounded while the changes were made. Such a result would clearly undermine the goals of the NLRA and the remedial powers of the NLRB.

Respondent also maintains that these changes were made for sound business reasons rather than for the purpose of undermining the Union and were part of changes applied on a national level. This Court does not challenge the assertion that the Respondent's actions were for a business purpose, but "whether unlawfully motivated or not, an employer violates Section 8(a)(5) and (1) where it makes changes in terms and conditions of employment during the pendency of objections to an election which ultimately results in the certification of the union." Mike O'Connor Chevrolet, 209 NLRB at 704, *citing* NLRB v. Fleming Manufacturing Company, Inc., 119 NLRB 452, 465 (Jan. 1, 1957).

Having said this, the Petitioner's request for complete recission of all unilateral changes does create practical issues. For instance, healthcare coverage cannot be "rolled back." There is no testimony that employees went without coverage, only that premiums were increased, and the Respondent has made plans available to choose from during an open enrollment period. Similarly, the objected to changes in job classifications/descriptions/titles/grades, assignments, and schedules raise practical concerns that would require the Court to micro-manage the employment relationship. As such, they are best addressed in collective bargaining discussions and do not warrant injunctive relief at the present time.

The same is true of the employer's 401(k) match. Summarily rescinding the unilateral change could cause issues that cannot be foreseen, such as amending tax returns, speculating as to whether the employee would have participated and how much his or her contribution would have been. The reality today is that the 401(k) match is being reinstated effective January 2012. The Court finds that as to the years 2009, 2010, and 2011, the matter is best addressed in the collective bargaining discussions. While the Court is aware that this has the effect of requiring the Union to

negotiate for a return of a benefit that was previously in place, the practical effect of outright recision of the change by Court order is not, at this time, an appropriate means to resolve the issue. With that in mind, the Court will reserve ruling on this issue and set the matter for telephonic status conference in mid-January 2012.

The unilateral change as to merit pay increases does warrant immediate action by this Court. The Respondent actually made two unilateral changes with respect to merit pay. The first (before the Union was certified) taking it away and the second (after the Union was certified) giving it back to all employees except these bargaining unit members. Respondent testified that there are nearly 18,000 employees nationwide and stated that the exclusion of the 170 employees in this case was done as a result of ongoing bargaining negotiations with the Union. Assuming that this was done in good faith rather than as a bargaining tool, the effect of this action could nevertheless chill the bargaining unit employees' support, create dissension and/or cause members to question whether their bargaining unit can adequately represent them, as well as undercut or undermine the Union's status as the statutory representative of the employees at the very time that the bargaining is occurring. The unilateral action as to merit pay is therefore rescinded. To the extent that this relief needs further implementation, the Court reserves the right to revisit the issue upon the motion of either party. Additionally, if an alternate resolution of this issue is otherwise reached through good faith negotiations between the Union and the Respondent, the Court would be willing to entertain a request to modify the terms of the injunction.

## CONCLUSION

For the reasons set forth above, the Petition for Injunctive Relief under Section 10(j) of the National Labor Relations Act, as amended [#1] is GRANTED IN PART. The parties are directed to confer and submit a proposed order reflecting these rulings for the Court's review within 14 days.

ENTERED this 9th day of November, 2011.

s/ James E. Shadid<br>
James E. Shadid<br>
United States District Judge